# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

RICHARD KELLY,         :
                         :
        Plaintiff,      :
                         :
        v.              :      CIVIL ACTION NO.
                         :      1:07-CV-0089-JOF
STAFFORD TRACTOR COMPANY  :
and STAFFORD DEVELOPMENT   :
COMPANY,                 :
                         :
        Defendants.   :

## OPINION AND ORDER

This matter is before the court on Defendant's motion for leave to file excess pages [24]; Defendant's motion for summary judgment [25]; Plaintiff's motion for leave to file excess pages [29]; Defendant's motion for leave to file excess pages [35]; Defendant's motion to strike [38]; and Plaintiff's motion for leave to file excess pages [39].

## I.    Background

### A.    Procedural History and Facts

Plaintiff, Richard Kelly, filed suit against Defendants Stafford Tractor Company and Stafford Development Company, on January 11, 2007, alleging discrimination on the basis of age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C.

§§ 626, *et seq.* Plaintiff amended his complaint on October 1, 2007, to add a claim for beach of contract.

Stafford Development Company is a family-owned business headquartered in Tifton, Georgia. One of Stafford Development Company's divisions sells and services heavy equipment through a wholly-owned subsidiary, Stafford Tractor Company.[1] DeNean Stafford is the Chairman of Stafford Development's Board of Directors.

Plaintiff was born in 1940 and was 65 at the time his employment with Stafford ended. He has worked in the heavy equipment industry for 40 years. Plaintiff was originally hired by Stafford as General Manager of its Lawrenceville branch on October 15, 2001. In January 2003, the then-President of Stafford, David Crockett, told Plaintiff he was going to split the position into a Sales Manager and a General Manager and recommended that Plaintiff take the Sales Manager position because of his sales experience. Plaintiff accept the Sales Manager position. Approximately a month later, however, Plaintiff resigned from Stafford because he had accepted a job with a local competitor who offered more money.

In December 2003, Crockett again approached Plaintiff about returning to Stafford to manage a new division of the company focusing on the sale of used heavy equipment. This new division was called Stafford Heavy Iron. Plaintiff accepted employment as

---

[1]For clarity, the court will refer to Defendants only as Stafford.

AO 72A
(Rev.8/82)

General Manager of Heavy Iron. On December 8, 2003, Plaintiff and Stafford entered in to a Compensation Plan outlining Plaintiff's job duties and compensation guidelines. Under the terms of the Compensation Plan, Plaintiff was to (a) resell equipment in a scheduled time frame, (b) purchase equipment at a value to maximize 15-20% margins, (c) manage the company to consistent profits, and (d) control expenses with generally accepted accounting procedures. Stafford also used a computerized invoice program. The court addresses below the extent to which Plaintiff was expected to utilize this system.

Under the terms of the Compensation Plan, Plaintiff was to be paid $78,000 per year. Plaintiff was also eligible to receive a sliding scale commission ranging from 5-15% of the gross profit margin based on deals he successfully closed, as well as a 10% commission on Heavy Iron's profits based on audited financials for the fiscal year ending July 2004. The Compensation Plan specifically outlines Plaintiff's commissions as: "7. G.M. [General Manager] will receive a commission of 10% of company profits. (audited financials on or about July 2004)." *See* Plaintiff's Depo., Exh. 8. At the bottom of the sheet of paper documenting Plaintiff's compensation is the statement: "Compensation plan is for the time period of 12-8-2003 through 6-30-2004." *Id.* After July 2004, Heavy Iron continued to pay Plaintiff his same salary and sales commissions. But Plaintiff was never paid 10% of Heavy Iron's yearly profits. In its first full fiscal year, Heavy Iron realized between $200,000 and $250,000 in profits. In its second full fiscal year, Heavy Iron was experiencing a year-to-

3

date profit at the time Plaintiff was terminated, although its monthly revenues at the time of termination were not profitable.

Plaintiff was employed as Heavy Iron's General Manager from December 2003 through March 2006. After some financial losses, Stafford decided to reorganize the company. As part of the reorganization, Stafford decided to disband the used heavy equipment sales division and put it back under the larger umbrella of Stafford Tractor. Stafford originally interviewed Billy Brice, Sr. to take Plaintiff's position as General Manager. Brice, Sr. was in his mid-to-late fifties at the time of the offer. Brice, Sr., however, had planned to undergo back surgery which resulted in him being unable to work for three months. While Brice, Sr. was recuperating, Stafford decided to lay-off its then-acting Vice President of the Lawrenceville branch, Denver Weinstiger. Stafford decided to hire Brice, Sr. for that position. At Brice, Sr.'s suggestion, Stafford decided to hire Brice, Sr.'s son, Billy Brice, Jr., to fill the General Manager position previously held by Plaintiff. Brice, Jr. was 36 years old at the time and had worked with his father in the heavy equipment business for ten years.

On March 14, 2006, John Wall, President/CEO of Stafford and Plaintiff's supervisor, discussed with Plaintiff Stafford's plans to disband Heavy Iron and to offer Plaintiff a salesman position in Raleigh, North Carolina. Wall testified that they discussed that Plaintiff would be receiving the same salary and commission rate that he had at Heavy Iron.

*See* Wall Depo., at 125-26. Plaintiff told Stafford on March 17, 2006, that he would not take the position in Raleigh. At the time he terminated Plaintiff, John Wall was fifty years old. Wall testified that he spoke with Plaintiff on a couple of occasions about his failure to use the computerized invoice system and the fact that he was paying too much for equipment the company was then trying to re-sell. Wall, however, also stated that he had never put anything in writing about Plaintiff's job performance and had never told Plaintiff that he would be terminated if his performance did not improve. *See* Wall Depo., at 93-95, 110.

### B.    Contentions

Defendant argues that Plaintiff cannot establish a prima facie case of age discrimination because he was not qualified for his job and he was not replaced by a similarly situated individual substantially younger than he was. Defendant contends that Plaintiff was terminated because of poor job performance and that Plaintiff cannot demonstrate this reason was pretextual. With respect to Plaintiff's breach of contract claim, Defendant asserts that the Compensation Plan agreement had an unambiguous termination date and Plaintiff cannot use parole evidence to show that the parties intended for the contract to continue beyond the stated termination date.

Plaintiff responds that he can make out a prima facie case of discrimination because he was replaced by a 36-year-old outside the protected class. Plaintiff also argues that Defendant's concerns with his job performance were pretextual and conflict with the

testimony of several of his co-workers. On his breach of contract claim, Plaintiff contends that there is no merger clause in the Compensation Plan so the court can consider the testimony of Plaintiff and the Stafford manager who negotiated the Compensation Plan. Plaintiff further asserts that the company continued to pay him in the manner settled in the initial Compensation Plan thereby renewing the terms of the Plan.

## II.  Discussion

### A.  Motion to Strike

Plaintiff submitted the declarations of David Crockett, former President of Stafford Tractor until 2004; Denver Weinstiger, former President of Stafford Tractor; and Steve Judkins, Machinery Manager for Stafford Equipment from December 2001 through May 2006. The testimony of these three gentlemen forms a great portion of Plaintiff's argument that Defendant's proffered reason for Plaintiff's termination was pretextual. Defendant asks the court to strike substantial portions of this testimony for a variety of evidentiary reasons.

#### 1.  Crockett Declaration

Defendant asks the court to strike Paragraphs 8, 9, 14, 24, 25, 26, 37, and 39 of the Crockett Declaration because they contain inadmissible hearsay. The relevant portions of the declaration state: "We hired Mr. Kelly to manage Stafford Heavy Iron because of his long-term continued experience in the used construction equipment industry. The people

6

I spoke to about Mr. Kelly before I hired him considered Mr. Kelly a serious professional in the industry." *Id.*, ¶ 8.

> One area in which Mr. Kelly has extensive experience is the evaluation of equipment. In fact, most of Stafford Tractor's sales team, as well as managers, would ask Mr. Kelly for his advice regarding trade values on equipment, so they could substantiate a possible sale that involved a trade-in. I also know that a number of other used equipment operators in the Atlanta area would approach Mr. Kelly requesting his opinion regarding used equipment values.

*Id.*, ¶ 9. Neither of these paragraphs contains inadmissible hearsay. Mr. Crockett supervised Plaintiff from December 16, 2003, through late summer or early fall 2004. Mr. Crockett's testimony explains why Plaintiff was hired for the job and shows what Mr. Crockett saw of Plaintiff's performance in his role as Plaintiff's supervisor.

Mr. Crockett's Declaration goes on to state:

> Mr. Kelly's compensation/incentive plan included a $78,000 annual salary (paid bi-weekly), commissions of 15% of the gross profit on retail sales out of our normal trading area and wholesale to other dealers or brokers in or out of our trading area (paid monthly), and a 10% bonus, based on the yearly gross profit of the division (payable at the end of the fiscal year).

*Id.*, ¶ 14. Mr. Crockett negotiated the compensation/incentive plan with Plaintiff. Therefore, his statements as to the contents of the plan are not inadmissible hearsay.

> The "Marketing Team" at Stafford Tractor (Frank Jones, Steve Edwards, and DeNean Stafford) empowered company managers to make decisions, manage their businesses, and be entrepreneurs. The message given to managers was to grow their businesses and the company would let them know if and when adjustments were needed.

7

*Id.*, ¶ 24. "On a monthly basis Mr. Kelly reported financial results and inventory information to the Marketing Team. Most discussions at those meetings involved used equipment management, values of equipment, used equipment market condition, profit and loss predictions, and personnel." *Id.*, ¶ 25.

> A number of times during these meetings, the Marketing Team would inform Mr. Kelly that they wanted him to purchase equipment that might be considered in the "rare atmosphere" (i.e., equipment most other dealers might not inventory due [to] the type of equipment it was and its value). The purchasing decisions regarding that type of equipment was made as a team.

*Id.*, ¶ 26. Any statements made by the Marketing Team to Mr. Kelly would not be inadmissible hearsay because they are statements of a party opponent as management of Stafford Tractor. Mr. Crockett's declaration states that it is made on the basis of personal knowledge, and as Plaintiff's supervisor and a manager, himself, Mr. Crockett would be privy to this information.

Mr. Crockett continued: "On several occasions during my employment with Stafford Tractor Company and Stafford, I heard upper level managers making statements regarding the company wanting to recruit a younger workforce." *Id.*, ¶ 37. "I also attended numerous monthly management meetings conducted in DeNean Stafford's office in which the Marketing Team asked Mr. Kelly if he had found a young man who would eventually replace him." *Id.*, ¶ 39. Again, these are admissible as statements of a party opponent.

AO 72A
(Rev.8/82)

Defendant asks the court to strike Paragraphs 12 and 13 of Mr. Crockett's declaration as violative of the Parole Evidence Rule.

> Since Stafford Heavy Iron was a start-up company, Mr. Kelly and I realized that the compensation/incentive plan might need to be adjusted in the future. For that reason, I included an end date on the contract, which reflected the end of Stafford's fiscal year. However, placing that date on the contract was <u>not</u> meant to suggest that the terms would not carry forward.

> At the time we signed the contract, Mr. Kelly and I specifically discussed the fact that our intent was to renew the compensation/incentive plan when its term expired. At that time, we would review the contract and make any needed modifications. We also agreed that if no changes were necessary, all of the terms of the original written contract were to carry over for the following fiscal year (i.e., July 1, 2004 to June 30, 2005).

*Id.*, ¶¶ 12-13 (emphasis in original). The court will not strike these paragraphs from Mr. Crockett's declaration but does discuss below whether they may be considered by the court in light of the Parole Evidence Rule keeping in mind the contract does ***not*** contain a merger clause.

Finally, Defendants ask the court to strike Paragraphs 15, 16, 17, 18, 19, 20, 21, 22, 23, and 32 on the basis that they were not made with personal knowledge and are "grossly speculative."

Mr. Crockett states:

> I recall that Stafford Heavy Iron had a positive cash flow, but its parent company, Stafford Tractor, did not.

> While I cannot remember the exact cash flow Stafford Heavy Iron produced, my recollection is that the first full fiscal year that Stafford Heavy

9

Iron was in existence (i.e., the July 1, 2004 to June 20, 2005 fiscal year), the division produced somewhere in the $200,000 to $250,000 range.

To my knowledge Mr. Kelly was never paid a bonus for the first full fiscal year, which he was entitled to under our contract.

I am not sure how to explain, "consistently failed to meet profitability" benchmarks. In this business one month might exceed a second month in profitability, and the next month less or even greater, due to the fact of converting rentals, what month of the year (winter versus summer), weather (such as rain causing failure to conduct business in a favorable purchasing atmosphere), or not having the correct mix of inventory to present to the customers.

In addition, the profit margin on a machine can vary, depending on the customer, and the market value of a particular piece of equipment can change from one point in time to another.

Stafford Heavy Iron's profitability was also affected by the fact that it was a start-up company and, therefore, it did not have a reputation as being a used dealer. It may take two (2) to five (5) years [] before a company becomes known among the industry customer base and becomes a consistent month-to-month operating business.

When I supervised Mr. Kelly, the majority of the equipment he purchased for resale did produce a profit, which further grew Stafford Heavy Iron's reputation with the Atlanta/Georgia market.

It is also my recollection that Mr. Kelly achieved a 12% overall margin in equipment sales. That is a very solid, good percentage.

My recollection is that Stafford Heavy Iron's original operating budget was set for a 15% overall margin in equipment sales, But, even though the budget was set at 15%, most dealerships (probably 9 out of 10) would not only approve of a 12% margin, but would consider it as a job well done.

*Id.*, ¶¶ 15-23. Mr. Crockett also testified:

> Mr. Kelly was dependent upon Mr. Judkins to get this paperwork done in a timely and consistent fashion. However, I know there were many times when Mr. Kelly had to push Mr. Judkins to make his deadlines. As a result of having to deal with these invoicing issues, Mr. Kelly lost time prospecting for customers.

*Id.*, ¶ 32.

Each of these statements is clearly based on Mr. Crockett's personal knowledge both of Stafford Heavy Iron and of the used equipment sales business in general. Further, there is no "grossly speculative" statement. The fact that Mr. Crockett uses the term "recollection" or cannot cite a specific figure does not indicate that his statement is speculative. In any event, that is an area of attack that would go toward the weight of the evidence and not its admissibility.

For the foregoing reasons, the court declines to strike any portion of Mr. Crockett's declaration.

### 2. Denver Weinstiger Declaration

Defendant asks the court to strike Paragraphs 25 (incorrect number 21), 26 (incorrect number 22), 27 (incorrect number 23), and 28 (incorrect number 24) for inadmissible hearsay.

Mr. Weinstiger testified:

> To my knowledge, at that point in time, Mr. Kelly had no definitive plans to retire. However, as a manager, the fact that Mr. Kelly was at or near retirement age was something I had to consider and contemplate.

11

I was not the only manager at Stafford who shared this viewpoint. On several occasions during my employment, I observed upper level managers making statements related to the company's desire to recruit a younger workforce.

For example, I was present at a business meeting in December 2004 that was held prior to a quail-hunting trip at Ochlocknee Plantation in Sylvester, Georgia. The meeting was conducted by Steve Edwards, Stafford's Chief Operating Office. At that time, Mr. Edwards spoke to us about the necessity to attract qualified young people for our various businesses, and he challenged us to hire our replacements.

I was also present at a monthly management meeting held in the office of the Chairman of the Board, DeNean Stafford. During that meeting Mr. Kelly was asked to find a young man to train as his replacement.

*See* Weinstiger Decl, ¶¶ 25-28 (incorrect number 21-24). To the extent that Mr. Weinstiger's testimony reflects the statements of management at Stafford Tractor, they are admissible as statements of a party opponent.

Defendants ask the court to strike Paragraphs 6, 7, 9, 11, 18, 19, 20, 21, 22, 29 (incorrectly numbered as 25), 30 (incorrectly numbered as 26), 31 (incorrectly numbered as 27), 33 (incorrectly numbered as 29), and 34 (incorrectly numbered as 30) because they are not based on personal knowledge or are "grossly speculative." In these paragraphs, Mr. Weinstiger testifies:

It was my understanding that Stafford Heavy Iron had been created in late 2003 or early 2004 and Mr. Kelly was the General Manager for the new company.

12

When I arrived in November of 2004, Stafford Heavy Iron had already begun to generate a profit since the beginning of the fiscal year [] (i.e., July). While there were months that were not profitable, the year to date results reflected a profitable operation under Mr. Kelly's guidance. That trend continued until I left the company in March of 2006.

Mr. Kelly accepted the integration of Stafford Heavy Iron and Stafford Tractor. In fact, he was always supportive of my efforts and the vision we had to grow the business, which we did very rapidly in the short time I was at Stafford Tractor.

The accounting person assigned to Stafford Tractor and the Heavy Iron division was incapable of doing the job, creating continuous problems and errors. It was very tedious to get errors corrected and became a very frustrating exercise. Mr. Kelly experienced this situation monthly. The business system was new and woefully undeveloped, which resulted in us having incomplete and incorrect data to run the business.

There were a couple of occasions when the book value on a piece of equipment was high due to unanticipated repairs. That is typical of the used equipment business.

There were also several pieces of trade-in equipment that were inherited from previous management that had been grossly overvalued. However, those machines were not in the Heavy Iron inventory. Mr. Kelly and I struggled to move these over-valued machines while minimizing the loss, but we were unsuccessful in doing so before we both left the company.

Mr. Kelly's compensation plan was created and agreed upon before I arrived at Stafford. I did not see it until mid-2005.

As I recall, the compensation plan was quite lucrative for Mr. Kelly if Heavy Iron did well.

13

It was my understanding that Mr. Kelly's compensation plan was still effective for the fiscal year covering July 2004 through June 2005, but the plan was in need of revisions to reflect future volumes. Mr. Kelly and I discussed this on one occasion, but I had not made a revised proposal prior to my departure from Stafford.

Mr. Kelly and I did not always agree on how to do things regarding the used equipment business; however, I believe that normal and in many cases healthy for the organization.

Being a strategic thinker and planner, evaluating personnel and determining if they are capable of reaching goals is an ongoing process for me. In doing so during my tenure at Stafford, I never had any serious thoughts about replacing Mr. Kelly.

If I had believed replacing Mr. Kelly was necessary while I was at Stafford, I would have done so. I had to terminate five people while I was employed at Stafford. Three of those were managers. I think that should indicate that I would do whatever was necessary.

I had sensed I was going to be terminated by Mr. John Wall and that was confirmed the day I resigned.

Mr. Wall had been recruiting my replacement, Mr. Billy Brice Sr. prior to the [d]ay I resigned. I know this because I was required to attend one of the initial interviews with Mr. Brice.

*Id.*, ¶¶ 6, 7, 9, 11, 18, 19, 20, 21, 22, 29 (incorrectly numbered as 25), 30 (incorrectly numbered as 26), 31 (incorrectly numbered as 27), 33 (incorrectly numbered as 29), and 34 (incorrectly numbered as 30). The statement: "It was my understanding that Stafford Heavy Iron had been created in late 2003 or early 2004 and Mr. Kelly was the General Manager for the new company" *id.*, ¶ 6, and the statement: "Mr. Kelly's compensation plan was created and agreed upon before I arrived at Stafford. I did not see it until mid-2005" *id.*, ¶ 20, are

14

hearsay and will be stricken from Mr. Weinstiger's declaration. The remainder of the statements all involve Mr. Weinstiger's actions as President of Stafford Tractor Company of Lawrenceville. There is no speculation or hearsay in these statements.

          3.     <u>Steve Judkins</u>

Defendant asks the court to strike Paragraphs 12, 13, and 14 of Mr. Judkins' Declaration as based on "gross speculation." Mr. Judkins testified:

> Mr. Kelly continued to support Stafford Equipment, even after he departed to Stafford Heavy Iron.
>
> For example, I also recall several occasions when Stafford Equipment had a customer who wished to see a machine or retrieve a repaired machine on a weekend day (when Stafford Equipment was closed). Mr. Kelly was often willing to meet the customer at the yard and assist in any way he could (supervising the machine movement, showing and discussing our machine, etc.).
>
> In summary, I wish to state that Mr. Kelly was a joy to work with at Stafford Equipment and Stafford Heavy Iron. I enjoyed learning much of what I now use everyday in this business from Mr. Kelly.

*See* Judkins Decl., ¶¶ 12-14. There is nothing speculative in these statements. They merely reflect Mr. Judkins' opinion of Plaintiff and the work he did for Stafford. The court will not strike any portion of Mr. Judkins' declaration.

For the foregoing reasons, the court GRANTS IN PART AND DENIES IN PART Defendants' motion to strike [38].

**B.      Age Discrimination Claim**

The ADEA prohibits an employer from discharging or otherwise discriminating against an individual with respect to the compensation, terms, conditions, or privileges of his employment on the basis of his age.  29 U.S.C. § 623(a).  Plaintiff admits that he has no direct evidence of age discrimination.   Instead, he relies on circumstantial evidence and therefore must establish a prima facie case of discrimination by showing that he (1) was a member of the statutorily protected age group between the ages of forty and seventy, (2) was qualified for the job, (3) was subjected to an adverse employment action, and (4) was replaced by someone substantially younger. *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc); *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1359 (11th Cir. 1999); *see also Stamey v. Southern Bell Tel. & Tel. Co.*, 859 F.2d 855, 859 (11th Cir. 1988).

There is no dispute that Plaintiff was a member of the statutorily protected age group and that he was subjected to an adverse employment action.  Defendants contend that Plaintiff was not qualified to do the job because he was terminated for performance reasons. Because Defendants are not arguing that Plaintiff was not qualified for the job before he took it, but rather that his poor performance on the job rendered him unqualified, the court finds that such a discussion is more appropriately handled at the pretext level.  While some of Defendants' performance arguments are "objective" in the sense that he did not meet a

16

15-20% profit margin, others are "subjective," such as Plaintiff's alleged inability to be a "team player" and "resentful" treatment of management. *See*, *e.g.*, *Vessels v. Atlanta Independent School System*, 408 F.3d 763 (11th Cir. 2005) (to demonstrate qualification at the prima facie stage, employee must only address "employer's objective qualifications," employer may then "introduce its subjective evaluations of the plaintiff at the later stages of the *McDonnell Douglas* framework").

Defendant also avers that Plaintiff was not initially replaced by someone outside of the protected class. The exact chronology of events regarding Billy Brice, Sr., can be discerned from the record. Wall testified that Stafford had made the decision to consolidate its operations under the Stafford name in August 2005. *See* Wall Depo., at 51. By December 2005 or January 2006, this consolidation had been completed. However, operations at Stafford Heavy Iron continued until April or May 2006. *See* Wall Depo., at 28-32. Sometime in early to mid-February 2006, a group of senior management from Stafford interviewed Billy Brice, Sr., to take Plaintiff's job and agreed that Brice, Sr., was their choice to fill the position. *Id.* at 49. Wall testified that he knew at that time that Plaintiff would be removed from his position. *Id.* at 121. At the end of February or beginning of March 2006, Brice, Sr., learned that his recuperation time from back surgery would take significantly longer than he had expected. *Id.* at 61. In the meantime, Stafford had also made the decision to terminate Weinstiger. *Id.* at 62. Therefore, Stafford

AO 72A
(Rev.8/82)

management decided to offer Weinstiger's position to Brice, Sr. *Id.* In response, Brice, Sr., suggested that the company hire his son, Brice, Jr., to take Plaintiff's position. By mid-March, Stafford had hired Brice, Jr. *Id.* at 47, 63. Construing the evidence in the light most favorable to Plaintiff, the court finds that Plaintiff was not replaced by Brice, Sr., but rather by Brice, Jr. Stafford knew by the beginning of March that it would be Brice, Jr., taking Plaintiff's place and not Brice, Sr. Because they knew before Plaintiff's termination, the court finds that Brice, Jr., is the proper comparator. Clearly, Brice, Jr., at age 36 at the time he was hired, is outside the statutorily protected age group and "substantially younger" than Plaintiff.[2]

As a subset of this argument, Defendants contend that Brice, Jr., was not similarly situated to Plaintiff because due to the reorganization, Brice, Jr.'s job duties were not the same as the job duties Plaintiff had. As Plaintiff points out, however, Brice, Jr., started work the day Plaintiff was fired and the reorganization did not take place for another two months.

---

[2]Further, even if Brice, Sr. (who was in his mid-to-late fifties at the time he was hired), were the comparator, Plaintiff could still establish a prima facie case because replacement by a person within the protected age group does not result in an absolute bar to his establishment of a prima facie case. *See Eskra v. Provident Life & Acc. Ins. Co.*, 125 F.3d 1406, 1411 (11th Cir. 1997) ("In an ADEA action, the plaintiff is not required to show that the replacement employee was under the age of 40, and outside the protected class."). *See also Carter v. DecisionOne Corp.*, 122 F.3d 997, 1003 (11th Cir. 1997) (per curiam) (plaintiff could establish prima facie case of age discrimination with only three-year age difference between him and comparator).

AO 72A
(Rev.8/82)

It is clear from the evidence in the record, therefore, that Brice, Jr., was Plaintiff's replacement in all respects.

Because Plaintiff has established a prima facie case of age discrimination, the burden now shifts to Defendant to articulate a legitimate nondiscriminatory reason for its actions concerning Plaintiff. *Chapman*, 229 F.2d at 1024. This burden is merely one of production, not persuasion, and it involves no credibility assessment by the court. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). Defendant contends that Plaintiff's performance fell short of expectations and they fired him for this reason. Defendant outlines five areas in which it alleges Plaintiff had performance problems: (1) Plaintiff failed to use the computerized invoice system, (2) Plaintiff overpaid for several pieces of heavy equipment resulting in losses to Heavy Iron,[3] (3) Plaintiff failed to meet Stafford's expectations of a 15-20% profit margin on Heavy Iron's sale of used equipment,[4] (4) Plaintiff had a resentful attitude toward upper manager, and (5) Plaintiff was not a "team player." The court finds that Defendant has met its burden of producing a legitimate non-

---

[3]Defendants note that on March 8, 2006, Plaintiff purchased two CAT 621F Motor Scrapers at an auction in Montgomery, Alabama, for $170,000 each. Heavy Iron paid $25,000 in repairs and $5,000 in freight charges. One Scraper recently sold for $150,000. The other is still awaiting sale.

[4]Defendants note that from July 2005 through February 2006, Heavy Iron experienced a 75% shortfall on its expected year-to-date profits and a 70.2% shortfall on its expected February 2006 profits.

19

discriminatory reason for termination and that the presumption of discrimination drops from the case. *See id.*; *Chapman*, 229 F.2d at 1024.

Plaintiff now must come forward with "significantly probative evidence that the proffered reason is a pretext for discrimination." *City of Miami,* 870 F.2d 578, 584 (11th Cir. 1989). He may do this by directly persuading the court that Defendant more likely was motivated by a discriminatory reason or by indirectly showing that the employer's explanation is not believable. *See Cooper v. Southern Co.*, 390 F.3d 695, 726 (11th Cir. 2004) ("To show that the employer's reasons were pretextual, the plaintiff must demonstrate such weaknesses, implausibilities, inconsistences, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credit.") (quotation and citation omitted).

As an initial matter, the court notes that the parties talk past one another on a particular aspect of the pretext analysis. Defendants contend that Plaintiff asks this court to inappropriately second-guess Defendants' business judgment in determining that Plaintiff was not meeting expectations. The court disagrees. Plaintiff does not argue that Defendants improperly evaluated Plaintiff; rather, Plaintiff argues that Defendants fired him for reasons based on his age and later trumped up the charges of performance problems in order to hide their true reasons. That is, Plaintiff contends that he has presented sufficient evidence from

20

which a jury could conclude that Defendants' job performance rationale should be disbelieved.

Overall, Plaintiff argues that no one from Stafford ever indicated to him that his performance was not satisfactory. As the court outlined above, Wall testifies that he did tell Plaintiff that he needed to use the computerized system and needed to be better about pricing purchases for resale, but he did not ever tell Plaintiff that his job was in jeopardy and did not document any of the problems he had with Plaintiff's performance. *See* Wall Depo., at 93-95, 110. Plaintiff contends, therefore, that Defendants did not have a problem with his performance until they decided to terminate him.

Specifically, Plaintiff argues that Defendants' concerns with Plaintiff's ability to utilize Stafford's computerized invoice system are a post-hoc rationalization for Plaintiff's termination. Plaintiff testified that he was never intended to use the system and was, in fact, never given access to the system because Heavy Iron was never connected to the main Stafford computer system. *See* Plaintiff's Depo., at 117. Instead of having to carry each invoice over to Stafford's main office, Plaintiff would take the sales order over, and Machinery Manager Steve Judkins would prepare the invoice. *Id.* at 116. Plaintiff was specifically told by Crockett not to use the Stafford system. *Id.* at 117. *See also* Crockett Decl., ¶ 29; Weinstiger Decl., ¶¶ 12, 14. Rather, the procedure was for Heavy Iron's invoices to go through Stafford Tractor's system. *See* Crockett Decl., ¶ 29. Judkins was to

AO 72A
(Rev.8/82)

create computerized invoices for both Stafford Tractor and Heavy Iron. *Id.*, ¶ 30; Weinstiger Decl., ¶ 13; Judkins Decl., ¶¶ 7-8. Plaintiff would give his handwritten notes to Judkins who would enter the pertinent information into the computer system and generate the invoices. *See* Crockett Decl., ¶ 31; Judkins Decl., ¶¶ 9-10. Defendant argues that Plaintiff never learned the system as he was supposed to and the fact that other employees had to input Plaintiff's invoices slowed the entire division down.

Defendants argue that Plaintiff was not purchasing used equipment with a proper eye toward profit on resale. The main equipment problem Defendants point to is Plaintiff's purchase of two scrapers at an auction in Alabama. The scrapers were purchased for $170,000 each. Heavy Iron paid $25,000 in repairs and $5,000 in freight charges. One Scraper recently sold for $150,000. The other is still awaiting sale. As Plaintiff points out, however, Defendant had made the decision to terminate Plaintiff *before* this auction took place. Therefore, Defendants cannot use these pieces of equipment as support for their decision to terminate Plaintiff based on his performance. Furthermore, Mr. Crockett and Mr. Weinstiger testified that they could not recall any occasion where Plaintiff overpaid for equipment. Mr. Crockett remembers that most of the equipment Plaintiff purchased for resale did produce a profit.

Plaintiff also proffered testimony to challenge Wall's conclusion that Plaintiff was resentful and not a team player. Judkins testified that Plaintiff was open to new ideas,

helpful to employees, and was willing to go out of his way to help customers. *See* Judkins Decl., ¶¶ 11-13. Judkins and Crockett testified that Plaintiff was a team player. *See* Judkins Decl., ¶ 13; Crockett Decl., ¶ 34. Crockett testified that he did not find Plaintiff difficult to work with or resentful, nor did he ever hear Stafford's Chairman, COO, or CFO express that sentiment. *See* Crockett Decl., ¶¶ 33, 35. Weinstiger testified that Plaintiff was always supportive of Weinstiger's efforts at Stafford and helped to grow the company. *See* Weinstiger Decl., ¶ 9.

The court further notes that Wall's testimony, itself, casts doubt on Defendants' argument that the whole reason it engaged in the Heavy Iron reorganization was that Plaintiff was not handling the division properly. Rather, in Wall's deposition, he states that the company had decided in 2005 that it wanted to reorganize and bring all divisions under the Stafford name in a more integrated fashion to further the Stafford brand.

Finally, in addition to challenging each of Defendant's performance based reasons for termination, Plaintiff points to several comments made by Stafford management that do not rise to the level of direct evidence of age discrimination, but would allow a jury to conclude that Stafford had a bias against older employees. DeNean Stafford repeatedly asked Plaintiff when he planned to retire. *See* Plaintiff's Depo., at 155. During management meetings, Mr. Stafford would ask Plaintiff if he found a young man to become his replacement. *See* Plaintiff's Depo., at 150, 155-56; Crockett Decl., ¶ 39; Weinstiger Decl.,

¶ 24. During a management meeting, Chief Operating Officer Steve Edwards explained to Stafford's division presidents that they needed to attract young qualified managers to their companies. *See* Crockett Decl., ¶ 38; Weinstiger Decl., ¶ 23.

Stafford excuses these comments as part of its "succession planning," planning Stafford contends all sales companies undertake. There is nothing in age discrimination jurisprudence that would prevent a company from succession planning, however, the comments of Defendant's upper management went beyond mere planning into the direct suggestion that the manager should be looking for younger employees, and managers who were planning to retire should select someone younger to take their positions. Even Wall's explanation of succession planning does not encompass seeking out younger employees. Rather, Wall testified that you

> hear it for the accounting department, about training people to – to come up. You hear it in sales. You hear it in – in – I mean, it's not something that you – it's not something you hear every day, but it's something that you always – you always have on your mind that you want to – you want to bring up people that can – that can – that can learn this business, maybe move to another – run a branch for you or whatever.

*See* Wall Depo., at 39. The statements made by Stafford management are more than succession planning. They are a direction to hire younger employees; not a direction to assure that there are employees lined up capable of filling roles of increased responsibility.

To all of this, Defendants respond that Plaintiff did not meet certain objective criteria that the company expected as set forth in the Compensation Plan. Defendants also aver that

Plaintiff's charge of age discrimination is illogical in that it would not have offered Plaintiff a position with the company in North Carolina if it was biased against him on the basis of his age. Finally, Defendants also point out that Wall, the decision-maker, is a member of the protected class at the age of fifty. However, there is still a substantial fifteen-year difference between the age of Plaintiff at sixty-five and the age of Wall. The fact that Wall is over forty is not a sufficient basis upon which to reject Plaintiff's arguments of pretext.

Viewing the evidence as a whole in the light most favorable to Plaintiff, the court finds Plaintiff has proffered sufficient evidence from which a jury could disbelieve Defendants' proffered legitimate non-discriminatory basis for termination -- Plaintiff's job performance -- and rather based its decision to terminate Plaintiff on his age. Therefore, the court DENIES Defendants' motion for summary judgment on Plaintiff's age discrimination claim.

### C.    Breach of Contract

Plaintiff contends that Defendants breached the Compensation Plan agreement by failing to pay him commissions in the form of ten percent of the company profits for the fiscal years of July 1, 2004 through June 30, 2006. The parties' main area of dispute with respect to Plaintiff's breach of contract claim is whether there was any term of expiration in the Compensation Plan. As the court explained above, the Compensation Plan provided at the bottom of the document: "Compensation plan is for the time period of 12-8-2003

through 6-30-2004."  The Compensation Plan also outlines Plaintiff's commissions as:

"7. G.M. [General Manager] will receive a commission of 10% of company profits. (audited

financials on or about July 2004)."  *Id.*

The terms of the Compensation Plan clearly set a definitive expiration date of

June 30, 2004.  The manner of calculating the commissions on ten percent of the company's

profits also supports a termination date of June 30, 2004.  The Compensation Plan, however,

contains no merger clause, and Plaintiff has presented the testimony of David Crockett, with

whom Plaintiff negotiated the contract, who states:

> Since Stafford Heavy Iron was a start-up company, Mr. Kelly and I
> realized that the compensation/incentive plan might need to be adjusted in the
> future.  For that reason, I included an end date on the contract, which reflected
> the end of Stafford's fiscal year.  However, placing that date on the contract
> was <u>not</u> meant to suggest that the terms would not carry forward.
>
> At the time we signed the contract, Mr. Kelly and I specifically
> discussed the fact that our intent was to renew the compensation/incentive
> plan when its term expired.  At that time, we would review the contract and
> make any needed modifications.  We also agreed that if no changes were
> necessary, all of the terms of the original written contract were to carry over
> for the following fiscal year (i.e., July 1, 2004 to June 30, 2005).

*Id.*, ¶¶ 12-13 (emphasis in original).  Plaintiff also testified that when the Compensation Plan

reached the date of termination, no changes were made to Plaintiff's compensation and the

company continued to pay him the same salary and sales commission.  *See* Plaintiff's Depo.,

at 183-84.  The question then becomes whether there is any legal basis for looking past the

terms of the contract to consider Mr. Crockett's and Plaintiff's testimony that the Compensation Plan was not intended to expire.

Plaintiff argues that the court should consider the testimony of Plaintiff and Mr. Crockett because the contract is "uncertain." The court disagrees. In two places, the Compensation Plan refers to a date of termination. One, the agreement, itself, states, "Compensation plan is for the time period of 12-8-2003 through 6-30-2004." There is nothing uncertain about this statement. Two, in the provision for calculation of commission based on company profit, the agreement states, "G.M. will receive a commission of 10% of company profits. (audited financials on or about July 2004)." Again, there is no ambiguity in this statement. It does not say that the profit will be based on the audited financials of the company at the end of the fiscal year; it specifies July 2004. Plaintiff's argument about uncertainty relies on an ambiguity in the original contract. The contract here is not uncertain. *See*, *e.g.*, *Pine Valley Apts. v. First State Bank*, 143 Ga. App. 242, 245 (1977) ("a contract which is originally and inherently too indefinite may later acquire precision and become enforceable by virtue of the subsequent acts, words, or conduct of the parties. . . . Thus, the objection of indefiniteness may be obviated by performance and acceptance of performance."). Therefore, the court agrees that it is not appropriate to consider parole evidence -- here, in the form of Plaintiff's testimony and Mr. Crockett's declaration that the

27

Compensation Plan was intended to cover more than one year -- in the face of the unambiguous terms in the Compensation Plan's terms.

Plaintiff, however, offers another more persuasive argument. It is undisputed that after the June 30, 2004 termination of the Compensation Plan, the parties continued operating under the terms of the Compensation Plan. *See* Plaintiff's Depo., at 106-07; 183-84. This continued performance renders the contract enforceable. *See Gram Corp. v. Wilkinson*, 210 Ga. App. 680, 681-82 (1993) ("Where, as here, the parties abided by the terms of the contract without dispute for approximately two years, it was not error to find it to be enforceable."). Other jurisdictions addressing the issue have implied an extension to an employment agreement if the employment continues and the parties act as though the old agreement has been extended. *See, e.g.*, *Cherne Contracting Corp. v. Marathon Petroleum Co.*, 2008 WL 398809 (D. Minn. 2008) ("In Minnesota, parties to an expired contract can impliedly modify and extend the contract through their post-expiration conduct."); *Fenno v. Jacobe*, 657 S.W.2d 844 (Tex. App. 1983) ("It has been held that continuance of the employment is, as a matter of law, continuation of the old contract. . . . We hold, therefore, . . . that appellants by their continuing to work and accept the benefits from their original contracted employment without change or objection on their part, continued the original obligation in full force and effect until they . . . terminated their employment") (quotation and citation omitted); *Borne Chemical Co. v. Dictrow*, 445

28

N.Y.S.2d 406 (N.Y. App. Div. 1981) ("It is the rule that when, upon the expiration of a contract of employment for a definite term, the employee continues to render the same services as he rendered during the term of the contract without expressly entering into any new agreement, it will be presumed that he is serving under a new contract having the same terms and conditions as the original one (53 Am Jur 2d, Master & Servant, § 23) . . ."). Thus, the court finds that the parties' continued performance under the contract extended the terms of the contract.

Defendant then contends that even if the terms of the Compensation Plan still applied, Heavy Iron did not make a profit after 2004, so Plaintiff would not have been entitled to the ten percent commission anyway. That assertion, however, does not comport with Wall's deposition testimony. There, Wall testified that there was a loss for the fiscal year ending June 30, 2004. For the fiscal years ending in 2005 and 2006, there was a profit. But there was no profit for the fiscal year ending 2007. *See* Wall Depo., at 134. Thus, as the terms of the Compensation Plan were extended, Plaintiff is entitled to commission on any profits Heavy Iron made during the time Plaintiff was employed there.

For the foregoing reasons, the court DENIES Defendants' motion for summary judgment as to Plaintiff's breach of contract claim.

29

### III. Conclusion

The court GRANTS Defendants' motion for leave to file excess pages [24]; DENIES PART Defendants' motion for summary judgment [25]; GRANTS Plaintiff's motion for leave to file excess pages [29]; GRANTS Defendants' motion for leave to file excess pages [35]; GRANTS IN PART AND DENIES IN PART Defendants' motion to strike [38]; and GRANTS Plaintiff's motion for leave to file excess pages [39].

The parties are DIRECTED to file a pretrial order within thirty (30) days from the date of this order.

**IT IS SO ORDERED** this 19th day of February 2009.


_____s/ J. Owen Forrester_____
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)